PANISH SHEA & BOYLE LLP
RAHUL RAVIPUDI, State Bar No. 204519
  *ravipudi@psblaw.com*
JESSE MAX CREED, State Bar No. 272595
  *creed@psblaw.com*
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California  90025
Telephone: 310.477.1700
Facsimile: 310.477.1699

MILLER ADVOCACY GROUP PC
MARCI LERNER MILLER, State Bar No. 162790
  *marci@milleradvocacy.com*
1303 Avocado Ave., Suite 230
Newport, CA 92660
Telephone: (949) 706-9734

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

HALIE BLOOM, an individual; DEVON LINKON, an individual; EMMA L., an individual; K.B. an individual, as legal parent of JOHN DOE, a minor; STEVEN and MOLLY M., individuals, as legal parents of SAM M., a minor; MICHELLE G., an individual, as a legal parent of ALEX G., a minor; ANDREW L., an individual, as legal parent of CAROLINE L., a minor.

　　　　　Plaintiff,

　　　v.

ACT, INC., a corporation, and DOES 1-100.

　　　　　Defendant.

Case No.

NATIONWIDE CLASS ACTION COMPLAINT FOR VIOLATIONS OF:

1. AMERICANS WITH DISABILITIES ACT – SCORE FLAGGING (42 U.S.C. § 12101, et seq.)

2. UNRUH ACT (California Civil Code §51 et seq.)

3. AMERICANS WITH DISABILITIES ACT – SCORE FLAGGING IN STATE-ADMINISTERED  TESTS (42 U.S.C. § 12101, et seq.)

4. CONSTITUTIONAL RIGHT TO PRIVACY (California Constitution, Art. I, § 1)

5. UNFAIR COMPETITION  LAW (Business & Professions  Code § 17200 et seq.)

6. AMERICANS WITH DISABILITIES ACT DENIAL OF EQUAL OPPORTUNITY IN ACT'S PROGRAMS (42 U.S.C. § 12101, et seq.)

7. DECLARATORY  JUDGMENT ACT (28 U.S.C. § 2201)

DEMAND FOR JURY TRIAL

Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

Plaintiffs HALIE BLOOM, an individual, DEVON LINKON, an individual, EMMA L., an individual, K.B., an individual, as legal parent of JOHN DOE, a minor, STEVEN and MOLLY M., individuals, as legal parents of SAM M., a minor; MICHELLE G., an individual, as the legal parent of ALEX G., a minor; ANDREW L., an individual, as legal parent of CAROLINE L., a minor ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against ACT, Inc. ("ACT") and DOES 1-100.  Plaintiff's allegations are based on information and belief unless otherwise indicated.

## INTRODUCTION

1.    This action arises out of ACT's illegal disclosure and sale of highly sensitive and confidential information about students' disabilities to colleges and universities. The sale and disclosure of student disability data are flagrant violations of the privacy and civil rights of students with disabilities.  ACT profits off these violations and uses them to gain an edge in the marketplace over its only competitor, the College Board, which does not disclose students' disabilities to colleges and universities.

2.    ACT is a powerful gatekeeper to higher education and employment opportunities because it administers a standardized test widely required for college admissions (the "ACT Test"). ACT exploits its role as gatekeeper by illegally requesting and acquiring the confidential disability status of students and whether those students require accommodations or "special provisions" for their disabilities.  ACT collects this information through the online ACT Student Profile Questionnaire that every student fills out when registering for the exam, as well as through its Student Information Form that test takers must respond to on test day without their parents, teachers or counselors present.

3.    ACT asks every student registering for the ACT Test if they have disabilities that require "special provisions from the educational institution [i.e. a college]," and asks them to choose a disability that "most closely describes your situation." The choices include hearing impairment, visual impairment, learning or cognitive disability, motor impairment, multiple disabilities, or no disability that requires special provisions. This question is part of the test registration process and is separate from the ACT accommodations request process. ACT does not use this information to determine whether to grant a student testing accommodations.  It uses this information to make money.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

4.      ACT knowingly uses this data in two impermissible ways.  First, ACT includes this detailed disability information in its score reporting services to colleges. In fact, ACT reports whether a student has a disability requiring accommodations and  the type of disability on the face of the score reports it sends to colleges. *See* Exhibit A.  Colleges can also purchase access to student score reports with information about a student's disabilities from ACT more frequently, and in different formats, so that they can sort their applicants in a way that is by definition exclusionary.  ACT discloses this student disability information to colleges, even though it knows that colleges are expressly forbidden by the Rehabilitation Act from making pre-admission inquiries into a student's disabilities.

5.      Second, ACT sells the same private and confidential disability data to colleges to make money. As a result of ACT's access to private student information, its share in the competitive enrollment services marketplace continues to grow.  ACT's dual role as gatekeeper of students and enrollment manager for colleges allows it to compete in the enrollment services business by representing to colleges and universities that it will help them "remove the guesswork," "target their recruiting efforts," "evaluate incoming students to make sure they have the tools to succeed," and "retain and graduate more students."

6.      As an example, student disabilities, classified by kind of disability, are listed as data elements in the searchable database ACT sells to its enrollment management clients (including colleges) as a tool to "find the right students for your institution."   ACT tells colleges in its ACT Information Manager marketing materials that "Looking at ACT scores alone is just the beginning," and it promises to help colleges "improve targeted enrollment programs," "ensure [students] have the tools to succeed," and "retain and graduate more students" by providing "data elements useful for academic support."

7.      As another example, through its new ACT Enroll Platform, ACT sells colleges personally identifiable data about students, including detailed student disability data, in a format that allows colleges to create targeted recruiting and enrollment markets for their specific needs. Through this electronic platform, institutions can create markets that intentionally exclude categories of students based upon the data elements provided, including students with disabilities.

8.      Through these programs, ACT is not only affecting the opportunities of students with

Case No.

NATIONWIDE CLASS ACTION COMPLAINT

disabilities in the fiercely competitive college admissions process.  It is also affecting their opportunities in future employment.  ACT's WorkKeys assessment, described as a workforce solution that "help[s] measure the workplace skills that can affect job performance," is now offered nationwide and required in 28 states, including Colorado and Nevada. Students who take their WorkKeys assessments with accommodations for their disabilities are classified in the WorkKeys data report as "ADA Candidate." Tens of thousands of employers may have access to this data at any given time.

9.    Students, parents, and their high schools are intentionally kept unaware of ACT's practice of reporting confidential disability status to colleges, because disability information is conspicuously absent from the ACT score reports they receive.

10.    Students, families and school counselors have every expectation that disability information will remain private.  Federal and state laws strictly protect the confidentiality of student disability records. The Individuals with Disabilities Education Act, 20 U.S.C. § *et seq.* ("IDEA"), safeguards the confidentiality of student disability status so rigorously that it regulates its collection, storage, disclosure and destruction and does not allow it to be handled by anyone who is not specifically trained.  The Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, also protects the confidentiality of information contained in a student's record and does not allow its disclosure without a parent's consent.  As a further protection, when records are no longer required to provide educational services, parents or students (over 18) can request their destruction. No parent (whose consent is not sought or obtained) or student would have any reason to believe that disability status is being disclosed to colleges on the ACT score report or sold as enrollment data.

11.    Even worse, ACT specifically tells students that it will not disclose their disability and accommodations information on their ACT score reports, because they know that such disclosure is wrong and illegal. ACT's Policy for Accommodations falsely informs students and parents that their score reports will not contain information about their disabilities or accommodations.

12.    ACT is alone among high-stakes testing agencies in its discriminatory practices.  As the administrator of the SAT, the College Board does not disclose student disabilities on its score reports. Despite years of disability discrimination lawsuits against testing agencies and legislation forcing them to remove any reference to disabilities in their score reporting, ACT continues to

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

4    Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1    flagrantly violate the rights of students with disabilities under federal and California law.

2    13.    ACT is exploiting its privilege of interacting with nearly every college-bound student, the vast majority of whom are minors, by illegally acquiring the students' disability and school accommodations status and using this information to increase its market share. A significant number of these students have no choice but to take the ACT Test. In at least twenty States, students are required by State law to take the test. And in at least eleven more States, students are required by State law to take some form of examination administered by ACT.

14.    Once ACT acquires this disability information from students, it uses it to illegally flag student test scores as associated with students who require special provisions due to disabilities, devaluing their test scores on the basis of their disabilities. ACT knows that flagging test scores of students with disabilities and who have tested with accommodations is illegal, and knows full well that colleges have no legitimate reason to see this information. The Rehabilitation Act expressly requires colleges to conduct "disability-blind" admissions and forbids preadmissions inquiries regarding disabilities.

15.    ACT has intentionally violated the rights of every college-bound student with disabilities, including Plaintiffs, by unnecessarily seeking to collect information about their disability status at registration for the ACT Test, illegally flagging their test scores, and illegally marketing and selling information about their disabilities to colleges and universities. ACT has announced no plans to cease these violations and will continue to violate the rights of students with disabilities who take the ACT Test in the future, including at the next administration of the exam in September 2018. Absent an injunction, ACT will continue to disclose students' disabilities to colleges on their score reports when students begin to apply for college on or after August 1, 2018. ACT is likewise continuing to sell student disability information to colleges and other institutions through its enrollment programs and services.

16.    In fact, on July 24, 2018, ACT announced the acquisition of NRCCUA, a "for profit" company engaged in selling student names and data to colleges, so that it can further expand its enrollment management reach. In their joint announcement, ACT and NRCCUA claimed that "together, we are the most skilled, innovative and effective organization in the higher education industry in delivering data science, analytics, research, measurement, and assessments."

17.    For the reasons stated below, Plaintiffs and members of the Subclasses (as defined below) are entitled to injunctive and monetary relief.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises at least in part under the laws of the United States.

19.     This Court likewise has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and the action is a class action in which members of the class of plaintiffs are citizens of a State different from ACT.

20.     Venue with this Court is proper in this district under 28 U.S.C. §1332 because Plaintiffs are residents of this district and a substantial portion of the acts or omissions giving rise to the claims herein took place in this district.

## COMMON FACTUAL ALLEGATIONS

### A.     The Value and Challenge of College Degrees for Students with Disabilities

21.     In today's America, a college degree is considered part of the American dream.  It is viewed as a powerful indicator of long-term economic security and social mobility, not to mention a path to active citizenship and informed participation in our democracy.  Four decades of research show that Americans with a college degree have higher family incomes than do adults with only a high school diploma.  In fact, if a child from the bottom fifth of America's poorest families earns a college degree, that child is remarkably four times more likely to reach the top fifth of America's richest families.  Recent studies have shown that these education-based income gaps are widening ever further.[1]

22.     Unsurprisingly, these trends extend to Americans with disabilities. College-educated Americans with disabilities have a significantly higher chance of finding employment than those without a college degree.  The U.S. Bureau of Labor found that 26% of Americans with disabilities with a bachelor's degree were employed in 2016, compared to 16% of those with no more than a higher school degree.  And the earning potential for college-educated Americans with disabilities is

---

[1] Ron Haskins, et al., *Promoting Economic Mobility By Increasing Postsecondary Education*, The Economic Mobility Project 7-10 (2009) ("Economic Mobility").

1    substantially greater.  In fact, college-educated Americans with disabilities make twice as much as

2    other Americans with disabilities, and nearly twice as much as their peers who fail to graduate

3    college.[2]  In short, a college degree is a powerful predictor of economic security and social mobility

4    for Americans with disabilities, too.

5        23.    Plaintiffs are all college-bound students, or students who have applied or been admitted

6    to or enrolled in college programs.  They took or plan to take the ACT Test for purposes of meeting

7    college admission requirements.  Successfully earning a college degree will have a profound effect on

8    their long-term economic security, job prospects, and earning potential, as it does for all Americans.

9    Receiving the necessary financial and scholarship opportunities to pay for college will allow them to

10   be more successful in college and be more likely to complete their college degree on time.

11       24.    Many Americans with disabilities have achieved enormous success after obtaining a

12   college degree.  Charles Schwab, the founder of the Charles Schwab Corporation and a multi-

13   billionaire, has suffered from dyslexia his entire life, forcing him to communicate in ways other than

14   reading and writing.  He is also a graduate of Stanford University.  Mr. Schwab is now increasingly

15   vocal about the challenges he has faced as an American with a disability.  His recent advocacy is a

16   testament to the struggles he faced with dyslexia, which he describes as "painful."[3]  Other success

17   stories of college-educated Americans with learning disabilities like dyslexia or attention deficit

18   disorder are a sign that Americans with disabilities can succeed too.  These Americans includes John

19   Chambers, the former chief executive of Cisco Systems and a graduate of the University of Virginia,

20   who has been open about the years of therapy he underwent to cope with the emotional pain of his

21   dyslexia; David Neeleman, the former chief executive of JetBlue Airways, a dyslexic, and a graduate

22   of the University of Utah; and Craig O. McCaw, the founder of McCaw Wireless and Clearwire

23   Corporation, a dyslexic, and a graduate of Stanford University.

24       25.    Congress has recognized the importance of a college degree to Americans with

---

[2] Michelle Yin, et al., *An Uneven Playing Field: The Lack of Equal Pay for People with Disabilities*, American Institutes for Research 7 (2014).

[3] Rob Turner, *Executive Life; In Learning Hurdles, Lessons for Success*, N.Y. Times, Nov. 23, 2003, available at https://www.nytimes.com/2003/11/23/business/executive-life-in-learning-hurdles-lessons-for-success.html

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

7

Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

disabilities and the persistent discrimination they have faced in education and employment by enacting the Americans with Disabilities Act of 1990 ("ADA"), and in the Americans with Disabilities Act Amendments Act of 2008. Congress recognized that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society," yet found that "discrimination against individuals with disabilities persists in such critical areas as … education."  42 U.S.C. § 12101.  Colleges, universities and testing agencies like ACT are obligated under the ADA to ensure their programs and services give full and equal access to students with disabilities, including disability-blind admissions.  In 1992, the State of California incorporated the ADA into the Unruh Act, with all the remedies available to students thereunder.

26.     The National Student Clearinghouse Student Research Center reports that as of 2015, one third of students who started college will not finish within six years. For students with disabilities, especially those who do not find a culture of inclusivity or adequate support systems in college, that number could be even higher. ACT knows that the all-powerful rankings of higher education institutions by U.S. News & World Report and other publications take account of student retention and graduation rates.  The higher the student retention and graduation rates, the better the school's rankings, leading to more successful student and faculty recruitment and more pride among alumni (and annual giving dollars, too).  Because ACT believes students with disabilities are one category of students that perform worse in these areas, ACT sells personalized student disability data to colleges pre-admission to increase its market share in the testing and enrollment services businesses.

27.     Due to the substantial costs of low retention, as well as the detrimental effects on their all-important rankings, colleges have turned to outside enrollment managers like ACT and the student data they provide to tell them how to find and choose their students.

28.     ACT understands the market for detailed student data to predict who will attend and persist once enrolled. Therefore, in addition to objective data such as such as scores and demographics, ACT score reports sent to colleges also include predictions about a student's "Chances of Success." Disability status is included in what ACT believes to be an important data element for students' chances of success.  ACT also uses the unlawfully obtained disability status of students to sell "Predictive Modeling" services for colleges to take advantage of their fear of dropping retention

1   rates. The data elements sold to colleges for "retention uses" include the disability status of students.

2        29.     However, § 504 of the Rehabilitation Act expressly forbids colleges from making pre-

3   admissions inquiries about disabilities, screening students based upon disabilities or limiting the

4   number of qualified students they accept based upon disabilities. Labeling students based upon the

5   existence of a disability and type of disability, and then allowing students to be identified, sorted and

6   searched according to the disability is behavior that by definition violates the core purpose of the

7   ADA.

8        30.     In a wave of lawsuits over the past several decades, testing agencies and standardized

9   tests have been a battleground for student disability discrimination because of the central role they

10   play in college admissions.  ACT believes that college admissions officers want the disability data of

11   Plaintiffs, and so ACT flags their test scores, discloses their otherwise confidential information to

12   colleges pre-admission, and stigmatizes students with disabilities in the admissions process.

13        31.     In 2002 the College Board published a study entitled "The Impact of Flagging on the

14   Admission Process." The 2002 study set out to investigate the array of issues with respect to flagging

15   test scores of students with a disability who received an accommodation.  The conclusions are crystal

16   clear: College admissions offices want and use the information in their evaluation, and it is to the

17   disadvantage of students with disabilities.  As the study reports:

18        •  "Among the admission officers who responded to the survey, 79 percent are

19           proponents of the flag, expressing the need to maintain the flagging policy."

          •  "Some institutions report that they will drop the SAT if the flagging policy is
20           discontinued, while other schools would consider alternatives to the SAT."  (By

21           the way, that is exactly what has happened.  Since 2002 when the College Board
           completely eliminated flagging, the ACT Test has become the standardized test of
22           choice in college admissions.)

23        •  "Although the <u>legality of the following statement is questionable</u>, one [admissions
           officer] commented that given the finances, 'we have a zero-sum game in which
24           we are often taking resources away from the physically disabled because of the
           growing number of ADHD and LD students."

25        •  "The level of disability support services differs across institutions.  Some
           institutions simply cannot accommodate effectively the most severe disabilities.
26           Some institutions have difficulty accommodating mild disabilities" – meaning that
           college admissions will turn down a student with a disability because the student is
27           too expensive to accommodate.

28        32.     Unsurprisingly, disability service providers responding to the College Board survey

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

9

Case No.

1    uniformly condemned the practice of flagging. Fearing disadvantage, disability service providers

2    believed flagging threatened a students' chances of admission because "admission officers are more

3    oriented to rejection than to admission, particularly when it comes to candidates with disabilities."

4    The perspective of high school guidance counselors is an echo of this view. Thirty one percent of

5    high school guidance counselors felt that the flag decreased a student's chances for admission.

6    *33.*    In response to the College Board's 2002 study, both the College Board and ACT

7    announced that they would stop flagging the test scores of disabled students who received testing

8    accommodations. The ACT Press Release stated: "Our decision to stop flagging scores followed an

9    exhaustive analysis of the pros and cons of the flagging policy." "Our decision to stop flagging comes

10   after a thorough review," said Richard Ferguson, Chief Executive Officer of ACT.[4]

11   34.    Nonetheless, as described below, ACT blatantly continues to "flag" score reports by

12   disclosing student disabilities and their need for accommodations on their score reports to colleges.

13   35.    In 2004, the Office of Civil Rights of the Department of Education ("OCR")

14   investigated a complaint of disability discrimination by SUNY Health Science Center at Brooklyn's

15   College of Medicine ("SUNY"). The student alleged that SUNY supported the unlawful practice by

16   the administrator of the Medical College Admissions Test ("MCAT") of devaluing the student's

17   MCAT scores by reporting that the student received special testing accommodations for a disability.

18   The investigation decisively shows how admissions officers did in fact devalue standardized test

19   scores taken under special disability-related accommodations:

20       [SUNY's Admission Committee Co-Chair] further stated that he places less weight on an
21       asterisked MCAT score than on a nonasterisked score. He informed OCR that he would
         be wary of a very good asterisked MCAT score if he came upon it during the screening
22       process and that in the situation where an applicant had weak grades but strong asterisked
         MCAT scores, he would analyze the application more carefully. In addition, Co-Chair No.
23       2 stated that in a hypothetical situation where an applicant's MCAT score is greatly
         improved when taken under nonstandard conditions, he would want to know how and
24       which applicant had improved. Co-Chair No. 2 also informed OCR that if he were
         reviewing two applicants with the same "minimally acceptable" MCAT score, one taken
25       under nonstandard conditions and the other under standard conditions, and if all the other
         admissions criteria were in the acceptable range, he would think that the applicant who
26

27   _____

     [4] *Diverse Issues in Higher Education,* "SAT, ACT to Stop Flagging Student Test Scores," August
28   15, 2002, available at http://diverseeducation.com/article/2351/.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

10                                                                               Case No.

NATIONWIDE CLASS ACTION COMPLAINT

took the MCAT under standard conditions probably does not perform well on standardized tests and, therefore, the score would not be indicative of the applicant's ability. However, the same beneficial interpretation would not be afforded the applicant who had taken the MCAT under nonstandard conditions.

36.     As recently as 2014, the U.S. Department of Justice and California Department of Fair Employment and Housing obtained a landmark consent decree permanently ending the Law School Admission Council ("LSAC")'s practice of "flagging" Law School Admissions Test ("LSAT") score reports for test takers with disabilities receiving special accommodations.  That dispute centered on the LSAC's reporting and identifying the otherwise confidential information of examinees with disabilities that use testing accommodations to law schools.  Like ACT, LSAC reported score reports and disability status on score reports sent to law schools.

37.     Responding to the LSAC case, the California legislature enacted §99161.5 of the Education Code.  That provision makes clear that the disclosure of disability information with a score report is a blatant violation of the ADA as incorporated into the Unruh Act. It says that the reporting of a test score obtained by someone who received accommodations must not indicate in any way (either by disclosing or withholding information) that the score was earned by someone with accommodations: "The test sponsor of the Law School Admission Test shall not notify a test score recipient that the score of any test subject was obtained by a subject who received an accommodation pursuant to this section.  The test sponsor of the Law School Admission Test shall not withhold any information that would lead a test score recipient to deduce that a score was earned by a subject who received an accommodation pursuant to this section." Cal. Ed. Code § 99161.5. These provisions are not intended to be an expansion of existing law, but a declaration of what the law already required: "This subdivision does not constitute a change in, but is declaratory of, existing law." *Id.* Accordingly, these provisions apply as much to ACT with respect to the ACT Test as they do to the LSAC.

38.     In 2015, the U.S. Department of Justice, to which Congress has delegated broad responsibility to enforce the ADA, issued technical assistance on how scores on standardized and other high-stakes tests should be reported for students with disabilities under the ADA.  The guidance was as clear as it was strong: "Flagging policies that impede individuals with disabilities from fairly

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

Case No.

1  competing for and pursuing educational and employment opportunities are prohibited by the ADA. . . .

2  Flagging announces to anyone receiving the exam scores that the test-taker has a disability and

3  suggests that the scores are not valid or deserved." *See* DOJ Technical Assistance on Testing

4  Accommodations Under the ADA (September 8, 2015).

### B. ACT's Role as a College Gatekeeper

39.  ACT conducts the ACT Test, a standardized college-entrance exam accepted by virtually every four-year college program in the United States. According to ACT, the ACT Test is an assessment of high school students' college readiness. The test covers four skill areas: English, mathematics, reading, and science, and is offered multiple times a year. ACT states that the ACT Test correlates with the probability the student would successfully earn a college degree after admissions.

40.  ACT has the largest share of standardized test takers in America. For the high school class of 2017, 2.03 million students took the ACT Test, exceeding the number of SAT test takers by over 10%. In fact, ACT has a captured audience for the ACT Test, with a number of States requiring their high school students to take the ACT Test. Roughly 200,000 students per year request testing accommodations from ACT because of a disability, and about 94% of those requests are approved. ACT administers, manages and proctors the ACT Test multiple times each year at high schools across the United States and offers online ACT preparation programs and services, making the ACT a public accommodation within the meaning of the ADA.

41.  Every student that takes the ACT Test must register for the examination. The fee for taking the exam is $46 to $62.50 depending on whether the student elects to take an optional writing test. In addition, the fee for sending a score report to a college is $16.50 per score report, with each student sending score reports to an average of 8 colleges.

42.  Each section of the ACT Test is individually scored on a scale of 1 to 36, and then the average of those scores will make up a composite score. The score report shows how a student's score compares to those in the student's state as well as to those across the United States.

### C. ACT's Discriminatory and Illegal Inquiries into Disability Status

43.  ACT acquires information regarding a student's disabilities in two ways. First, students provide their disabilities during the online registration for an ACT Test. One component of the

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

12

Case No.

registration process is the Student Profile Section.  ACT describes the Student Profile Section as designed to "help you think about your future education and to help colleges in their planning."

44.    This component explicitly asks students if they have a disability.  The question asks whether the student has "a disability that requires special provisions from the educational institution."  The answers are prescribed through a drop-down menu of seven options:

- No disability that requires special provisions
- Hearing impairment
- Motor impairment
- Visual impairment (not correctable)
- Learning or cognitive disability
- Other disability
- Multiple disabilities

45.    Second, students are asked an identical question on testing day.  After students sit down to take the ACT Test, the very first task they perform is the completion of the Student Profile Section.  The proctor instructs the students on how to fill out this portion of the exam.

46.    Uncovering minor disabilities that do not impair a major life activity is clearly not the aim of this question.  The aim is to determine whether the student has a disability that "requires special provisions from the educational institution."  Knowing that the score reports are sent directly to admissions offices at colleges,  ACT seeks information that is of significance to them, including the need to assess "student fit," the resources required to educate and accommodate that student, and the testing accommodations used by the student to obtain their ACT score.

47.    The third source of student disability status is the student's request for accommodations.  To apply for accommodations, students are required to submit documentation of their disabilities through their school counselors. In order to demonstrate a history of testing accommodations and diagnosed disabilities, school counselors are encouraged by ACT to submit student records electronically through ACT's online system. The records include a student's history of prior testing accommodations in high school, IEP Plans, 504 Plans, and medical evaluations, all of which are highly confidential under federal and state law.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

NATIONWIDE CLASS ACTION COMPLAINT

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

48.     Plaintiffs and an overwhelming majority of the members of all Subclasses (as defined below) were under 18 years old when ACT collected their disability information.

**D.     ACT's Unlawful Use and Disclosure of Students' Disability Status**

49.      ACT uses student disability information in two primary ways which are both illegal.  First, ACT "flags" student score reports by disclosing detailed student disability information and the use of accommodations on the score reports it sends to colleges.  Second, ACT sells detailed student disability data to colleges, scholarship organizations, and other third parties who use it for recruitment, marketing, and other programs related to the admissions process.  ACT actively markets and sells these programs for revenue.

50.     First of all, every score report that goes to a college includes the student's score and certain "admissions enrollment data," including any "Physical/Learning Disability."  The score report also predicts the student's chances of success at the college where the report is sent, comparing the student to control groups with specific characteristics.  The score report ranks each student's chances of earning a "C" or better or a "B" or better in specific disciplines.  By disclosing disability data with the ACT score, ACT is suggesting that the score may not accurately reflect the aptitude of the test taker.

51.     The disclosure of physical or learning disabilities on the score report is intended in context to reflect disabilities that require testing accommodations.  This is clear from the language of the disability question itself which explicitly asks whether the student has a disability that "requires special provisions from the educational institution."  ACT does not seek information about disabilities that do not need any kind of accommodation, only those that do.  The response for a student with no such disability makes this abundantly clear: "No disability that requires special provisions."  Based on the question and answer choices, admission officers reviewing this data can reasonably assume that students with reported disabilities will not only need accommodations, but that they had testing accommodations as well.  This reporting practice flags and devalues disabled students' test scores and unfairly and illegally penalizes students with disabilities in the admissions process.   ACT misrepresented its intentions to stop the illegal practice of  "flagging" test scores in 2002, when it only changed its methods of flagging.

52.     ACT also misrepresents to students that their disability status will not be disclosed to colleges. The Policy for Accommodations provides: "ACT Score reports do not include any specifics about the disability or accommodations provided."

53.     As described herein, "flagging" score reports has been the subject of numerous civil rights lawsuits, government investigations, Technical Assistance documents, and California state legislation.  Disclosing a standardized exam score and a student's disability status together are prohibited by law, because this practice interferes with a student's exercise of his or her rights under Title II and Title III of the ADA to seek a testing accommodation.

54.     Second, ACT unlawfully uses the disability information it obtains by selling it to colleges and other postsecondary programs for their recruitment and enrollment purposes.

55.     One recruitment program sold by ACT is called the Educational Opportunity Service ("EOS"), described by ACT to test-takers as a way to "allow[] you [the student] to learn about educational, scholarship, career, and financial aid opportunities at no charge to you."

56.     The EOS program sells student disability data to enable colleges to personalize their recruiting efforts.  EOS is marketed to colleges as a way to sift through student data (including disability data) and make judgments as to those students worth recruiting.  According to ACT's marketing for EOS: "Search millions of Pre-ACT and ACT test takers and easily find the students best suited for your college or university. Pinpoint your direct marketing with expansive data utilizing predictive modeling in the process."

57.     ACT also offers the ACT Information Manager ("AIM") service which purports to contextualize ACT Test scores. AIM is marketed as a way to enable colleges to "turn data into actionable information" because "looking at ACT scores alone is just the beginning."  Among this actionable information is a student's disability status.  The goal of AIM is to help colleges target recruitment to achieve three goals: "assess student fit," "personalize recruitment," and "student retention."  According to ACT, colleges can use AIM to recruit "students who have desired characteristics."  ACT sells AIM for $708 for the first year and $480 every year thereafter.

58.     ACT also sells individualized student disability data to colleges and other postsecondary institutions as part of its enrollment management services under the brand ACT Enroll.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

15

Case No.

The purpose of ACT Enroll is to help the colleges "remove the guesswork," "target their recruiting efforts," "evaluate incoming students to make sure they have the tools to succeed," and "retain and graduate more students." Through its new ACT Enroll Platform, postsecondary institutions can purchase student names and data, including disability data, in a format that allows them to create targeted recruiting and enrollment markets for their specific needs. Through this electronic platform, institutions can create markets that specifically exclude categories of students based upon the data elements provided, including students with disabilities.

59.    The 2018 User Guide for ACT Enroll spells out how ACT allows colleges to create exclusionary markets.   The following is ACT's description of "creating a market" to target recruitment:

# Creating a Market

To create a market, select **Markets** on the left side of the screen. The Markets page will appear. Here, you can create student residence and school markets, view markets you created, and view the markets created by other users for your organization.

60.    Within each market or separate from each market, ACT allows postsecondary programs to sort by demographic characteristics, including student disabilities.   The following is ACT's description of "creating a population":

# Creating a Population

To create a population, select **Populations** on the left side of the screen. The **Populations** page will appear. Here, you can create populations, view populations you created, and view the populations created by other users for your organization. You can also filter the populations by a market to see all of the populations linked to that market.

61.    On a later page, ACT allows users to sort by demographic information, including "Physical/Learning Disability."  ACT notes that the "more filters you select, the more refined the data

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

set will be."

| Step | Action |
|------|--------|
| 6 | The **Demographics** page appears. Here, you can select demographic information, such as <br>• Gender <br>• Race/Ethnicity <br>• US Citizenship <br>• Family Income <br>• Physical/Learning Disability <br>• Religion <br>• Parental Education <br><br>Select demographic information by choosing the appropriate checkboxes under each section. The more filters you select, the more refined the data set will be. |

62.     Finally, ACT sells schools its Class Profile Service, which helps colleges "summarize cognitive and noncognitive variables at different stages of the enrollment funnel" and includes a data profile of incoming college classes including disabilities and "special needs."

63.     While College Board and ACT have discussed the potential for abuse with data-driven student recruitment and admissions, and both have discussed possibly monitoring how this data is used, ACT claims not to monitor the search criteria it sells to its customers. In the article entitled "Micro-Targeting Students: Increasingly sophisticated data slicing tools are changing student recruitment. Who benefits?" written by Ry Rivard on October 24, 2013, Jane Kesserling, a program director for ACT's enrollment management services said, "Pretty much any criteria that is available in the EOS system is pretty fair game; however they want to segregate their data is fine."

64.     ACT's disclosure of  student disability data is a blatant circumvention of the express prohibition on preadmission inquiries by colleges.  The Department of Education has warned colleges that any preadmission inquiry into disability status is illegal, except in the rarest of circumstances involving affirmative action programs.  OCR has often enforced this prohibition against postsecondary

Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

programs.[5]  There is virtually no permissible use of student disability information prior to admission, and ACT is circumventing this prohibition.

### E.    ACT's Special Statewide Testing Arrangements with the States

65.    ACT has over thirty-one special arrangements with States pursuant to which students are required to take the ACT Test or another type of ACT examination for high school student assessment.  At least twenty States require students to take the ACT Test, and as a result, every single high school student in twenty States takes the ACT Test.

66.    For example, beginning in 2016, Nevada's State Board of Education chose the ACT Test as the standardized exam for its College and Career Readiness Assessment.  Nevada juniors take the ACT Plus Writing, which consists of a 30-minute writing test and 215 multiple-choice questions in four subject areas: English, mathematics, reading and science. The test is administered at the student's school during a regular school day in either the end of February or early March.  A Nevada student may use the score from the statewide administration of the ACT Test for his or her college application.  Nevada high school students also take the WorkKeys examination which can certify then for the National Career Readiness Certificate and allow tens of thousands of employers to access their personal information, including disability information.

67.    Title II of the ADA requires the States to administer their educational programs requiring students to take the ACT Test in compliance with the ADA.  Section 12132 of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  The implementing regulations prohibit the States, "directly or through contractual arrangements," from "provid[ing] a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  28 C.F.R. §130(f)(iii).  States are required under the ADA to provide students

---

[5] *See, e.g.,* Letter from the Office of Civil Rights, U.S. Dep't of Justice to Gonzaga University, dated Nov. 8, 1996 (finding Gonzaga University violated the rule against preadmission disability inquiries).

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1   with disabilities taking a state-mandated standardized exam a reasonable accommodation.

2       68.     When a State engages a private party like ACT to administer a program, that private

3   party becomes subject to the State's obligations under Title II of the ADA.  In 1993, U.S. Department

4   of Justice ("DOJ") published a Technical Assistance Manual ("TAM") pursuant to its responsibility to

5   assist regulated public entities under Title II of the ADA in understanding the scope of their

6   responsibilities under the ADA.  *See* 42 U.S.C. § 12206.

7       69.     The TAM provides: "In many situations, however, public entities have a close

8   relationship to private entities that are covered by Title III, with the result that certain activities may

9   be at least indirectly affected by both titles."  The following are examples of the types of public-

10  private relationships that enmesh both Title II and Title III obligations in joint activities:

- "ILLUSTRATION 1: A privately owned restaurant in a State park operates for the convenience of park users under a concession agreement with a State department of parks. As a public accommodation, the restaurant is subject to title III and must meet those obligations. The State department of parks, a public entity, is subject to title II. The parks department is obligated to ensure by contract that the restaurant is operated in a manner that enables the parks department to meet its title II obligations, even though the restaurant is not directly subject to title II."

- "ILLUSTRATION 3: A city engages in a joint venture with a private corporation to build a new professional sports stadium. Where public and private entities act jointly, the public entity must ensure that the relevant requirements of title II are met; and the private entity must ensure compliance with title III. Consequently, the new stadium would have to be built in compliance with the accessibility guidelines of both titles II and III. In cases where the standards differ, the stadium would have to meet the standard that provides the highest degree of access to individuals with disabilities."

TAM II-1.3000.

21      70.     Many States and ACT recognize that students with disabilities taking a state-mandated

22  ACT-administered examination have rights under Title II of the ADA.  For example, in North

23  Carolina, a student with a disability may seek accommodations for the statewide administration of the

24  ACT Test.  But ACT has created two distinct classes of accommodations for students with disabilities

25  – those North Carolina is required to provide under federal disability laws and those the ACT is

26  required to provide under Title III of the ADA.  According to the North Carolina Department of

27  Public Instruction, the first class is called "Non-College-Reportable Accommodations" and the second

28  is called "ACT-approved accommodations."  The North Carolina Department of Public Instruction

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

19                                                    Case No.

clearly explains the consequences of not securing ACT-approved accommodations: "The ACT scores obtained with the use of Non-College Reportable Accommodations are not college reportable but are counted in participation for state accountability purposes." If a student with a disability wants an ACT Test score fully reportable to colleges, scholarships, and other institutions, the student must seek approval for the accommodations directly from ACT. ACT recognizes those standards are more burdensome and harder to satisfy. In fact, ACT recommends schools first apply for ACT-Approved Accommodations. If the student request is denied, then schools should consider Non-College Reportable Accommodations for the student.

71.     Registration for students required to take the ACT Test under State law is a process that is typically administered by public schools and other state educational agencies. Students are instructed and directed by State officials to register for the ACT Test online at school during regular school hours. Students with disabilities complete the same Student Profile Questionnaire as the one described above, with the same disability-related question. Students taking the ACT Test under a state-mandated administration sit for the ACT Test in State facilities, during regular school hours, and under the direction of official State employees.

72.     Private entities like ACT are strictly forbidden from interfering with a student's exercise of his or her rights under the ADA to secure testing accommodations. The ADA expressly prohibits anybody from "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. §12203(b). The implementing regulations of Title II expressly apply this anti-interference provision to private entities like ACT: "(b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 42 C.F.R. §35.134. As described above, ACT is blatantly interfering with students' rights to testing accommodations under Title II of the ADA by flagging their scores, acquiring and disclosing disability status on score reports, discriminating between college-

20

Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1    reportable and non-college reportable accommodations, and chilling students' exercise of ADA rights

2    under Title II.

### PARTIES

4    73.    Defendant ACT is an Iowa corporation headquartered at 500 ACT Drive, Iowa City, IA

5    52243.  ACT does business throughout the United States.

<u>Halie Bloom</u>

7    74.    Halie Bloom is an 18-year old resident of Newport Beach, California.  Ms. Bloom

8    graduated from a local public high school in 2018.  Ms. Bloom has a history of ADHD and a reading

9    disability similar to dyslexia.  She has had an individual educational plan (IEP) under the IDEA and a

10   504 Plan under the Rehabilitation Act since middle school. In high school, she had testing

11   accommodations consisting of a page of notes for exams, extended time on tests and quizzes, a

12   distraction-free setting for tests and quizzes, and exams and quizzes in audio format when necessary to

13   ensure proper comprehension of.  She took the ACT Test four times. ACT approved accommodations

14   consisting of multiple day testing with extended time and a distraction-free setting based upon her IEP

15   Plan.

16   75.    ACT acquired Ms. Bloom's disability status from testing registration and annotated

17   her score reports with "learning or cognitive disability" that requires special provisions.  ACT

18   disclosed Ms. Bloom's disabilities on all ACT Test score reports sent on her behalf to colleges to

19   which she applied and thereby flagged her score reports.  She had no expectation that ACT would

20   include her disability status with her score reports or otherwise ever disclose her confidential disability

21   information.

22   76.    ACT also disclosed her disability status through the EOS Program without her

23   permission. Ms. Bloom agreed to participate in the EOS program when she registered to take the

24   ACT. By responding "Yes" to EOS, Ms. Bloom agreed to disclose her "name, address, gender, high

25   school, email address, date of birth, year of high school graduation, racial/ethnicity background,

26   intended college major, and occupational choice to colleges, universities, financial aid and scholarship

27   agencies, and organizations that offer educational programs."  She did not agree to disclose her

28   disability status.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

77.    Without Ms. Bloom's permission, ACT disclosed her disability status to colleges, universities, scholarship organizations and other postsecondary organizations by listing Ms. Bloom's "learning and cognitive disability" as a searchable data element for Specific Advising and Retention Uses. ACT also disclosed her disability status in its other enrollment management and recruitment services, including the ACT Enroll program, enabling colleges and scholarship organizations to sort and exclude her on the basis of her disability status.

78.    Ms. Bloom has been admitted to University of Arizona and will enrolled in the Fall of 2018 with a partial scholarship.

79.    Ms. Bloom is an individual with a disability within the meaning of 42 U.S.C. § 12102. Her impairments substantially limit major life activities of reading, writing, learning concentrating, communicating, sitting for long periods, and the operation of major bodily functions of the brain.

Devon Linkon

80.    Devon Linkon is an 18-year old resident of Newport Beach, CA.  Devon L. is a graduate of a local public high school.  Mr. Linkon has a history of learning disorders, an auditory processing disorder and dyslexia.  In high school, Mr. Linkon had an IEP and 504 Plan beginning in sixth grade.  He was entitled to extra time on tests that require reading, separate exam rooms, confirmation of his comprehension of material, and test question clarifications.

81.    Mr. Linkon took the ACT Test four times. ACT approved testing accommodations for Mr. Linkon that consisted of multiple day and extended time testing.  ACT denied his request for a proctor to read the questions to him and his request for permission to eat snacks in the test room.  ACT acquired Mr. Linkon's disability status and annotated his score reports with "multiple disabilities" that require special provisions.  ACT disclosed Mr. Linkon's disabilities on all ACT Test score reports sent on his behalf to colleges to which he applied and thereby flagged his score reports.  He had no expectation that ACT would disclose his disabilities with his score reports or otherwise ever disclose his confidential disability information.

82.    Mr. Linkon has been admitted to University of Arizona and will enroll in the Fall of 2018 with a partial scholarship.

83.    Mr. Linkon is an individual with a disability within the meaning of 42 U.S.C.. § 12102.

Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

His impairments substantially limit major life activities of reading, writing, learning concentrating, communicating, sitting for long periods, and the operation of major bodily functions of the brain.

### Emma L.

84.     Emma L. is a 20-year old resident of Colorado.  Emma L. is a graduate of a public high school in the St. Vrain school district.  Emma L. has a history of ADHD, anxiety, processing speed disorders, and executive functioning disorder.  In high school, Emma L. had a 504 Plan that allowed her 50% extended time on tests and exams, preferential seating, a distraction-free environment for test-taking, frequent teacher monitoring and redirection from the teacher when necessary.

85.     Emma L. took the ACT Test 4 times. ACT approved testing accommodations for Emma L. that consisted of 50% extended time.  ACT acquired Emma L.'s disability status and annotated his score reports with "Learning and cognitive disabilities" that require special provisions. ACT disclosed Emma L.'s disabilities on all ACT Test score reports sent on her behalf to colleges to which she applied and thereby flagged her score report.  She had no expectation that ACT would disclose the disabilities ACT acquired with her score reports or otherwise ever disclose her confidential disability information.

86.     ACT also disclosed Emma L.'s disability status through the EOS Program without her permission. Emma L. agreed to participate in the EOS program when she registered to take the ACT. By responding "Yes" to EOS, Emma L. agreed to disclose her "name, address, gender, high school, email address, date of birth, year of high school graduation, racial/ethnicity background, intended college major, and occupational choice to colleges, universities, financial aid and scholarship agencies, and organizations that offer educational programs."  She did not agree to disclose her disability status.

87.     Without Emma L.'s permission, ACT  disclosed her disability status to colleges, universities, scholarship organizations and other postsecondary organizations by listing Emma L.'s "learning and cognitive disability" as a searchable data element for Specific Advising and Retention Uses. ACT also disclosed her disability status in its other enrollment management and recruitment services, including the ACT Enroll program, enabling colleges and scholarship organizations to sort and exclude her on the basis of her disability status.

88.     Emma L. currently attends a 4-year liberal arts college with partial financial aid.

89.     Emma L. is an individual with a disability within the meaning of 42 U.S.C. § 12102. Her impairments substantially limit major life activities of reading, writing, learning concentrating, communicating, sitting for long periods, and the operation of major bodily functions of the brain.

<u>John Doe</u>

90.     K.B. is a resident of Orange County, California and is the legal parent of John Doe.

91.     John Doe is a 17-year old resident of Orange County, California.  John Doe is a high school senior.  John Doe was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), written expression disorder and developmental coordination disorder in the third grade. He is prescribed medication for the management of ADHD. John Doe has received school accommodations since third grade and received accommodations in high school consisting of extended testing time, a distraction-limited testing environment, and multiple-day testing.

92.     John Doe took the ACT Test in September 2017.  ACT approved accommodations consisting of double time and multiple-day testing. John Doe requested accommodations on the basis of his psychoeducational report and school accommodations plan. John Doe scored a perfect 36 out of 36 on the ACT.  During the registration process, ACT acquired John Doe's sensitive disability status – "learning and cognitive disability." Absent injunctive relief from this Court, ACT will report John Doe's disability status to colleges on John Doe's ACT score report. John Doe had no expectation that ACT would report his disability status on his score report to colleges or ever disclose his confidential disability information.

93.     John Doe plans to apply for college in the Fall of 2018.  He aspires to attend a highly-ranked college or university such as an Ivy League university or a university with a similar level of selectivity.

94.     John Doe is an individual with a disability within the meaning of 42 U.S.C.. § 12102. His impairments substantially limit major life activities of reading, writing, learning concentrating, communicating, sitting for long periods, and the operation of major bodily functions of the brain.

<u>Sam M.</u>

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

Case No.

NATIONWIDE CLASS ACTION COMPLAINT

95.     Steven and Molly M. are residents of Las Vegas, Nevada and the legal parents of Sam. M.

96.     Sam. M. is a 17-year old resident of Las Vegas, Nevada.  He is enrolled in a high school in the Clark County School District in Nevada.  Sam M. has a history of autism that significantly affects his verbal and nonverbal communication and social skills, is often characterized by repetitive activities and stereotyped movements, resistance to changes in environment or daily routine and responding to sensory experiences in an unusual manner, and adversely affects his educational performance in a manner that causes significant delays or irregular patterns in learning.  In high school, he has received special education classes and has an IEP pursuant to which he receives testing and educational supports consisting of a small group setting, monitored breaks, and use of an electronic device.

97.     Sam. M. took the ACT Test in February 2018 as part of Nevada's state-wide mandate that every Nevada junior take the ACT Test. ACT approved accommodations in January 2018 based upon his IEP submitted by his school counselor.  His ACT accommodations consisted of a small group setting, extra time, and the ability to take the exam over the course of a day at his own pace. Sam M. currently has a 3.857 grade point average.  He intends to apply to college after graduating high school.

98.     Sam M. also took the ACT WorkKeys assessment as part of Nevada's state mandate. ACT's WorkKeys assessment can lead to the National Career Readiness Certificate. Sam's assessment results and disability status were reported to his school, the State of Nevada, and are stored in ACT's database that may be accessible to future employers.

99.     Sam M. is an individual with a disability within the meaning of 42 U.S.C.. § 12102. His impairments substantially limit major life activities of reading, writing, learning concentrating, communicating, sitting for long periods, and the operation of major bodily functions of the brain.

<u>Alex G.</u>

100.    Michelle G. is a resident of Sherman Oaks, California and the legal parent of Alex G.

101.    Alex G. is a resident of Sherman Oaks, California. He is a high school senior. Alex G. has a history of ADHD, anxiety, patent foramen ovale, migraines, and decreased vision.  In high

Case No.

NATIONWIDE CLASS ACTION COMPLAINT

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

school, Alex G. has had a learning plan that allows him to have double time on all tests, a distraction-free environment for testing, the ability to ask an adult clarifying questions, and a "cool-down" pass to give him time to de-stress.

102.     Alex G. plans to take the ACT Test in the upcoming school year.  He has registered for the ACT Test online.  During the registration process, ACT acquired information that Alex has a "Learning or cognitive disability" that requires special provisions and plans to annotate his score reports with that information.  ACT plans to disclose Alex G's disabilities on all ACT Test score reports sent on his behalf to colleges to which he applies and thereby flag his score report absent injunctive relief from this Court. Alex G. said "yes" to EOS when he registered for his ACT account. He agreed to disclose his "name, address, gender, high school, email address, date of birth, year of high school graduation, racial/ethnicity background, intended college major, and occupational choice to colleges, universities, financial aid and scholarship agencies, and organizations that offer educational programs." He did not agree to disclose his disability status to anyone, but absent injunctive relief, ACT will sell Alex G.'s disability status to colleges, universities and other institutions, and will add his disability status into its searchable database.

103.     ACT has sold or plans to sell Alex's disability data to colleges in order to help colleges create recruiting markets that exclude certain populations, including students like Alex with disabilities.  As a result, Alex has been or, absent relief from this Court, will be excluded from the recruiting efforts of colleges by virtue of the fact the student data provided to colleges is fully searchable on the basis of a student's disability status.

104.     Alex G. plans to apply to colleges and attend after high school. Alex G. also plans to apply for scholarships and financial aid.

105.     Alex G. is an individual with a disability within the meaning of 42 U.S.C.. § 12102. His impairments substantially limit major life activities of reading, writing, learning concentrating, communicating, sitting for long periods, and the operation of major bodily functions of the brain.

<u>Caroline L.</u>

106.     Andrew L. is a resident of Colorado and the legal parent of Caroline L.

107.     Caroline L. is a resident of Colorado and a rising senior in high school.  Caroline has a

Case No.

NATIONWIDE CLASS ACTION COMPLAINT

1  history of ADHD, anxiety, and a reading disability.  Caroline L. has a learning plan that allows her

2  extra time on exams, preferential seating away from distractions, small group settings, a calculator for

3  math, a computer with spell check, the ability to retake exams, copies of notes when requested,

4  frequent breaks, oral assessments, access to audio text, alternative assessments in lieu of exams,

5  multiple sittings, and teacher-approved note cards.

6       108.    Caroline L. took the ACT Test twice, once in April 2018 and once in June 2018.  ACT

7  approved testing accommodations for Caroline L. consisting of double time, a computer for the essay,

8  and multiple-day testing.  ACT rejected Caroline's request for triple time.  Caroline's school counselor

9  submitted a school accommodations plan and a psychoeducational report to ACT to support her

10  request for accommodations.  During the registration process, ACT acquired information that Caroline

11  had "multiple disabilities" that require special provisions from her school.  Absent injunctive relief

12  from this Court, ACT will report Caroline L.'s disability status to colleges on Caroline L.'s ACT score

13  report. Caroline L. had no expectation that ACT would report her disability status on her score report

14  to colleges or ever disclose her confidential disability information.

15       109.    Caroline L. plans to apply to colleges in the Fall of 2018 including Northeastern

16  University, Boston College and University of Vermont. Caroline also plans to apply for scholarships

17  and financial aid.

18       110.    Caroline L. is an individual with a disability within the meaning of 42 U.S.C. § 12102.

19  Her impairments substantially limit major life activities of reading, writing, learning concentrating,

20  communicating, sitting for long periods, and the operation of major bodily functions of the brain.

21       **CLASS ACTION ALLEGATIONS**

22       111.    Plaintiffs bring this action on behalf of themselves and a "Class" of similarly situated

23  persons, defined as and classified into the following Subclasses:

24      Subclass 1 (the "Nationwide Subclass"):  All students with disabilities in the

25      United States who, during the Relevant Time Period, (i) took the ACT Test, and

26      (ii) either (A) ACT acquired their disability data and sent it or plans to send it to

27      colleges, scholarships, or other third parties, or (B) ACT has not acquired their

28      disability because the students feared discrimination (the "Nationwide Subclass").

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

27

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

Subclass 2 (the "California Subclass"): All students with disabilities in California who, during the Relevant Time Period, (i) took the ACT Test, and (ii) either (A) ACT acquired their disability data and sent it or plans to send it to colleges, scholarships, or other third parties, or (B) ACT has not acquired their disability because the students feared discrimination.

Subclass 3 (the "State Mandate Subclass"): All students with disabilities required by State law to take the ACT Test who, during the Relevant Time Period, (i) took the ACT Test, and (ii) either (A) ACT acquired their disability data and sent it or plans to send it to colleges, scholarships, or other third parties, or (B) ACT has not acquired their disability because the students feared discrimination (i) took the ACT Test in the Relevant Time Period, and (ii) (A) either disclosed disability information to ACT and such disability information was sent to colleges, scholarships, or other third parties and was traceable to the student, or (B) refused to disclose disability information to ACT for fear of discrimination.

112. The Relevant Time Period is defined as the maximum amount of time permitted by applicable law.

113. <u>Numerosity</u>. Each Subclass is so numerous that joinder of all members is impractical. There are over a hundred students in each Subclass. The number and identities of such persons are ascertainable and identifiable based upon the records of the ACT.

114. <u>Commonality and Predominance</u>. There are multiple common questions of law and fact, the answers to which are apt to drive resolution of this case, and those common questions of law and fact predominate over any questions affecting only individual members. The common questions of law and fact include but are not limited to:

a) Whether ACT collected disability information from students taking the ACT Test.

b) Whether ACT disclosed such disability information to colleges, scholarships, and other third parties.

c) Whether ACT had authorization from students to disclose such disability information.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

d)      Whether ACT marketed the disability information to colleges as information that is useful to assist colleges with recruitment efforts and admissions.

e)      Whether ACT is a public accommodation or a person offering examinations related to applications for postsecondary institutions, in each case as defined by the ADA.

f)      Whether the ACT Test is offered to an individual in a manner accessible to persons with disabilities.

g)      Whether the ACT Test is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level, rather than reflecting the individual's impairment.

h)      Whether ACT knows or should have known that the disability information it disclosed to postsecondary institutions is being used to intentionally discriminate against students with disabilities or has a disparate impact on students with disabilities,

i)      Whether ACT knows or should have known that the disclosure of disability information to postsecondary schools was an illegal preadmission disability inquiry by such school.

j)      Whether ACT's collection and disclosure of disability information has a disparate impact on the opportunities students with disabilities have to be recruited by postsecondary schools, gain admission to postsecondary schools, or obtain financial aid or merit-based scholarships from postsecondary schools.

k)      Whether members of the State Mandate Subclass take the ACT Test pursuant to a State-sponsored program.

l)      Whether the provision of accommodations to students in the State Mandate Subclass is required by Title II of the ADA.

m)      Whether Title II of the ADA requires States involved in the State Mandate Subclass to ensure ACT complies with the States' obligations under Title II of the ADA.

n)      Whether disclosure of disability information with ACT Test scores interferes with a student's exercise of his or her right to testing accommodations or ACT programs and services

1    under the ADA.

2        o)      Whether members of each Subclass have incurred out of pocket losses as a direct

3    result of ACT's unlawful practices, including test registration fees, score report delivery fees, and

4    general damages.

5        p)      Whether disability information disclosed by class members was a legally protected

6    privacy interest within the meaning of California's constitutional right to privacy.

7        q)      Whether class members had a reasonable expectation of privacy as to the disability

8    information they disclosed to ACT.

9        r)      Whether the disclosure of the disability information by ACT is a serious invasion

10   of the privacy rights of the class members.

11       s)      Whether the collection and disclosure of disability information by ACT is an

12   unlawful, unfair, fraudulent, or deceptive business practice under California's Unfair Competition

13   Laws.

14       115.    <u>Superiority</u>.  A class action is superior to other available methods for fairly and

15   efficiently adjudicating this controversy.  Joinder of individual claims by all class members is

16   impracticable.  Even if every member of each Subclass could afford to sue, the court system would be

17   unnecessarily burdened by the influx of individual suits.  The prosecution of individual claims

18   presents the potential for unfairness as a result of inconsistent or contradictory judgments.  No

19   litigation concerning this controversy has already begun by any class or Subclass member.  By

20   contrast, the class action will efficiently adjudicate this controversy by resolving common questions of

21   law and fact, supporting economies of scale, and consolidating the claims under the supervision of a

22   single court.  Plaintiffs and their counsel are aware of no difficulties in managing a class action.

23   Proper notice to the class is reasonably feasible.  Members of each Subclass are readily identifiable

24   and can be notified based on available information, including ACT's information.

25       116.    <u>Typicality</u>.  Plaintiffs' claims are typical of the members of each Subclass.  All

26   Plaintiffs' claims are typical of the Nationwide Subclass because Plaintiffs are students with

27   disabilities who live in the United States, took or plan to take the ACT Test, ACT acquired their

28   disability data during registration or ACT failed to acquire their disability data because they feared

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

discrimination on the basis of their disability, and ACT has disclosed or plans to disclose such sensitive information to colleges and other third-parties with the students' score reports or as part of the student data services ACT offers colleges and universities. John Doe's, Alex G.'s, Mr. Linkon's, and Ms. Bloom's claims are typical of the California Subclass because they are students with disabilities who live in California, took or plan to take the ACT Test, ACT acquired their disability data during registration or ACT failed to acquire their disability data because they feared discrimination on the basis of their disability, and ACT has disclosed or plans to disclose such sensitive information to colleges and other third-parties with the students' score reports or as part of the student data services ACT offers colleges and universities. Sam M.'s claims are typical of the State Mandate Subclass because he is a student with disabilities who is a student in a State that requires their students to take the ACT Test under State law, took or plan to take the ACT Test as part of that mandate, ACT acquired their disability data during registration or ACT failed to acquire their disability data because they feared discrimination on the basis of their disability, and ACT has disclosed or plans to disclose such sensitive information to colleges and other third-parties with the students' score reports or as part of the student data services ACT offers colleges and universities

117. <u>Adequacy of Representation</u>. Plaintiffs have no interest that is adverse to, or which conflict with, the interests of the class and each Subclass, and they are able to, and will, adequately and fairly represent the interests of the class members and each Subclass. Moreover, Plaintiffs have retained highly qualified, experienced, and competent counsel to prosecute the claims of each class member, and they intend to prosecute the claims vigorously. The interests of the members of the class action will be fairly and adequately protected by Plaintiffs and their counsel.

118. <u>Rule 23(b)(2) Class</u>. ACT has acted or refused to act on grounds that apply generally to the class and each Subclass, so that final injunctive or declaratory relief is appropriate respecting the class as a whole.

119. Plaintiffs reserve the right to amend the definitions of the class and each Subclass, to add, divide or further reclassify the Subclasses, and to amend the class action allegations stated herein.

**<u>CLAIMS FOR RELIEF</u>**

NATIONWIDE CLASS ACTION COMPLAINT

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

**FIRST CAUSE OF ACTION**
**ADA VIOLATION – SCORE FLAGGING**
**(42 U.S.C. § 12189 and Implementing Regulations)**
**(On Behalf of the Nationwide Subclass)**

120.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if fully set forth herein.

121.    Plaintiffs have one or more physical or mental disabilities that substantially limits one or more major life activities.

122.    ACT offers the ACT Test, which is an examination related to applications for secondary or postsecondary education.

123.    The ADA requires that any person offering such examinations related "offer such examinations . . . in a place and manner accessible to persons with disabilities." 42 U.S.C. § 12189. Implementing regulations require the testing agency to offer the examination so that "[t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills." 28 C.F.R. § 36.309.

124.    ACT has violated its obligations under the ADA by maintaining a discriminatory policy of flagging test scores of individuals with disabilities, disclosing the disability status of the members of the Subclasses with each ACT Test score report, revealing to postsecondary programs that each member of the Subclass may have had a testing accommodation, signaling that the score may not accurately reflect aptitude or achievement, and otherwise disclosing sensitive disability information of Plaintiffs and members of the Subclasses.

125.    As a direct result of ACT's unlawful practices, the relevant Subclass members have incurred or will incur irreparable injury, including lost educational and scholarship opportunities.

126.    Unless and until ACT is enjoined, ACT will continue to discriminate against Subclass members on the basis of their disability, demonstrating a real and immediate threat of repeated injuries to the members of the relevant Subclasses and violations of their rights to full and equal access to the

1  ACT Test and ACT's programs and services.  Members of the relevant Subclasses lack any adequate

2  remedy at law, the balance of hardships favor members of the relevant Subclasses, and the public

3  interest would not be disserved by an injunction.

**SECOND CAUSE OF ACTION**
**ADA VIOLATION – SCORE FLAGGING AS INTERFERENCE WITH TITLE III ADA RIGHTS**
**(42 U.S.C. § 12203 and Implementing Regulations)**
**(On Behalf of all Subclasses)**

127.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if fully set forth herein.

128.    The ADA makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise of enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b).

129.    ACT's data practices with respect to disability information interferes with the rights of students with disabilities under the ADA to be treated equally in all ACT programs and services. These practices discourage students with disabilities from participating in ACT programs and services and seeking reasonable accommodations.  These practices likewise interfere with the rights of students with disabilities to have equal opportunity in college recruitment and admission programs as other students, regardless of disability status.

130.    As a direct result of ACT's unlawful practices, Subclass members have incurred or will incur irreparable injury, including lost educational and scholarship opportunities.

131.    Unless and until ACT is enjoined, ACT will continue to coerce and interfere with the rights of Plaintiffs and the Subclasses under the ADA, demonstrating a real and immediate threat of repeated injuries to the members of the relevant Subclasses and violations of their rights to full and equal access to the ACT Test and ACT's programs and services.  The Subclasses lack any adequate remedy at law, the balance of hardships is in their favor, and the public interest would not be disserved by an injunction.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

### THIRD CAUSE OF ACTION
### UNRUH ACT – VIOLATIONS OF THE ADA
#### (California Civil Code § 51 et seq.)
#### (On Behalf of California Subclass)

132.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if fully set forth herein.

133.    The Unruh Act provides that a "violation of the right of any individual under the federal Americans with Disabilities Act of 1990 … shall also constitute a violation of this section." Cal. Civil Code § 51(f).

134.    As here alleged, ACT's disability discrimination is a violation of Plaintiffs' and the Subclass members' ADA rights and is thus a violation of their rights under the Unruh Act.

135.    As a direct result of ACT's unlawful practices, Plaintiffs and the Subclass members have suffered actual damages in an amount to be determined at a jury trial, plus treble damages, but in any event no less than $4,000 in statutory damages for each and every offense and an award of attorney's fees.

136.    As a direct result of ACT's unlawful practices, Plaintiffs and the Subclass members have suffered emotional distress, anxiety, lost opportunity, frustration, humiliation, and loss of dignity and self-esteem, in an amount to be proven at trial.

137.    Unless and until ACT is enjoined, ACT will continue to violate the rights of the members of the Subclasses under the ADA and the Unruh Act, demonstrating a real and immediate threat of repeated injuries to the members of the relevant Subclasses and violations of their rights to full and equal access to the ACT Test and the ACT's programs and services.  Members of the relevant Subclasses lack any adequate remedy at law, the balance of hardships favor members of the relevant Subclasses, and the public interest would not be disserved by an injunction.

### FOURTH CAUSE OF ACTION
### CONSTITUTIONAL RIGHT TO PRIVACY
#### (Cal. Const. § 1)
#### (On Behalf of California Subclass)

138.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if fully set forth herein.

139.    Plaintiffs have a legally protected privacy interest in their disability status and any

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1    health or medical condition they may have.

2        140.    Plaintiffs have, or will have, a reasonable expectation of privacy that ACT would not

3    disclose their disability status in a manner that violates the ADA and the Unruh Act.  There is no

4    permissible use of such information by postsecondary institutions under existing law in recruitment

5    efforts and admissions decisions, and no parental consent to collect and disclose such information was

6    ever obtained.

7        141.    ACT's collection of information about a students' disability status and health and

8    medical conditions and disclosure to third parties are a serious invasion of the students' privacy

9    interests.  It is an egregious breach of social norms for ACT to assist postsecondary institutions with

10   obtaining disability, health, and medical information about students for the purpose of recruitment or

11   admissions.  The breach is especially egregious because ACT never had parental consent to obtain and

12   disclose this sensitive information.

13       142.    As a direct result of ACT's unlawful practices, Plaintiffs and the Subclasses have

14   suffered emotional distress, anxiety, lost opportunity, frustration, humiliation, and loss of dignity and

15   self-esteem, in an amount to be proven at trial.

16       143.    Unless and until ACT is enjoined, ACT will continue to violate the privacy rights of

17   the members of the Subclasses under the California Constitution, demonstrating a real and immediate

18   threat of repeated injuries to the members of the relevant Subclasses.  Subclass members lack any

19   adequate remedy at law, the balance of hardships is in their favor, and the public interest would not be

20   disserved by an injunction.

**FIFTH CAUSE OF ACTION**
**UNFAIR COMPETITION LAW**
**(Business & Professions Code § 17200 et seq.)**
**(On Behalf of all Subclasses)**

21
22
23

24       144.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if

25   fully set forth herein.

26       145.    California Business & Professions Code § 17200 et seq., also known as the California

27   Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful,

28   unfair, fraudulent, or deceptive business act or practice as well as "unfair, deceptive, untrue or

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1    misleading advertising."

2        146.    By engaging in the unlawful conduct alleged above, ACT has engaged in unlawful

3    business acts and practices in violation of the UCL by violating state and federal laws including but

4    not limited to the ADA, Unruh Act, and the California Constitution's right to privacy.

5        147.    In addition to being unlawful, ACT's acts, conduct and practices as alleged above are

6    unfair. ACT's policy and practice of collecting disability information and marketing it to

7    postsecondary institutions as useful, relevant, and appropriate information to use in making

8    recruitment and admissions decisions is a substantial injury to Plaintiffs, has no benefit to Plaintiffs,

9    and could not be avoided by Plaintiffs if Plaintiffs wished to participate in ACT's programs and

10   services on an equal basis as other students.

11       148.    In addition to being unlawful and unfair, ACT's acts, conduct and business practices as

12   alleged above are fraudulent and/or deceptive.  ACT used confidential student disability data and

13   marketed its programs and services as assisting postsecondary institutions and scholarship programs to

14   identify categories of students and exclude them from their recruitment and admissions efforts for

15   reasons like student fit and desirability.

16       149.    As a direct and proximate result of ACT's unlawful, unfair and fraudulent business

17   practices, Plaintiffs and the members of the Subclasses have been injured in fact. They participated in

18   the ACT Test or the ACT's programs and services in reliance on ACT's false and misleading

19   advertising and representations to the general public regarding the benefits of those programs and

20   services, and they would not have participated in the ACT Test had they known ACT would seek to

21   collect, use, disclose, and otherwise deny their full and equal participation in ACT's programs and

22   services.

23       150.    ACT's unlawful, unfair and fraudulent business practices as alleged above present a

24   continuing threat to Plaintiffs, the Subclasses and members of the public because ACT persists and

25   continues to engage in such practices and will not cease doing so unless enjoined or restrained by this

26   court.

27       151.    Under California Business & Profession Code § 17203, Plaintiffs, on behalf of

28   themselves, Subclass members and members of the general public, seeks an order of this Court:

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

a)    Enjoining ACT from continuing to engage, use, or employ any unlawful, unfair and/or deceptive business act or practice and any act prohibited by California Business Code § 17200 et seq.; and

b)    Restoring all monies that may have been acquired by ACT as a result of such unlawful, unfair or deceptive acts or practices.

## SIXTH CAUSE OF ACTION
## ADA VIOLATION – SCORE FLAGGING AS INTERFERENCE WITH TITLE II ADA RIGHTS
### (42 U.S.C. § 12203 and Implementing Regulations)
### (On Behalf of State Mandate Subclass)

152.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if fully set forth herein.

153.    The ADA makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise of enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b).  Implementing regulations provide: "No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or [implementing regulations of Title II of the ADA]." 42 C.F.R. § 35.134(b).

154.    ACT's practices with respect to disability information interferes with the rights of students with disabilities under the ADA to be treated equally in all programs and services provided by the States.  These practices discourage students with disabilities from participating in State programs and services administered by ACT and seeking reasonable accommodations under Title II of the ADA.  These practices likewise interfere with the rights of students with disabilities to have the opportunity to participate in college recruitment and admission programs equal to all other students, regardless of disability status.

155.    As a direct result of ACT's unlawful practices, members of the State Mandate Subclass have suffered actual damages in an amount to be determined at a jury trial and to the extent permitted

37                    Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1    by Title II of the ADA, plus an award of attorney's fees.

2    156.    As a direct result of ACT's unlawful practices, Plaintiffs and the Subclass members

3    have suffered emotional distress, anxiety, lost opportunity, frustration, humiliation, grief and loss of

4    dignity and self-esteem, in an amount to be proven at trial.

5    157.    Unless and until ACT is enjoined, ACT will continue to violate the rights of the

6    members of the State Mandate subclass under the ADA, demonstrating a real and immediate threat of

7    repeated injuries to the members of the relevant Subclasses and violations of their rights to full and

8    equal access to the ACT Test and the ACT's programs and services.  Members of the relevant

9    Subclasses lack any adequate remedy at law, the balance of hardships favor members of the relevant

10   Subclasses, and the public interest would not be disserved by an injunction.

11   158.    Members of the Statewide Mandate incurred or will incur irreparable injury, including

12   lost educational and scholarship opportunities.

13   159.    Unless and until ACT is enjoined, ACT will continue to coerce and interfere with the

14   rights of Plaintiffs and the Subclasses under the ADA, demonstrating a real and immediate threat of

15   repeated injuries to the members of the relevant Subclasses and violations of their rights to full and

16   equal access to the ACT Test and ACT's programs and services.  The Subclasses lack any adequate

17   remedy at law, the balance of hardships is in their favor, and the public interest would not be disserved

18   by an injunction.

**SEVENTH CAUSE OF ACTION**
**ADA VIOLATION – DENIAL OF PARTICIPATION IN COLLEGE RECRUITMENT AND MARKETING**
**(42 U.S.C. § 12182 and Implementing Regulations)**
**(On Behalf of all Subclasses)**

22   160.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if

23   fully set forth herein.

24   161.    Plaintiffs have one or more physical or mental disabilities that substantially limit one or

25   more of their major life activities.

26   162.    ACT's services and programs, including the ACT Test, AIM, EOS, and other services

27   that give college-bound students access and opportunities to admissions to postsecondary institutions,

28   are public accommodations under the ADA.

Case No.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

163. Under the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The ADA specifically prohibits: (i) "afford[ing] an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals," (ii) "provid[ing] an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals," and (iii) utiliz[ing] standards or criteria or methods of administration—(i) that have the effect of discriminating on the basis of disability." 42 U.S.C. §§ 12182(b)(1)(A)(i), (ii), 12182(b)(1)(D). The implementing regulations prohibit the same categories of activities. 42 C.F.R. §§ 36.202, 36.204. The DOJ's TAM for Title III prohibits public accommodations from making "unnecessary inquiries into the existence of a disability." U.S. D.O.J. ADA Compliance Manual § III-4.1300.

164. ACT is violating these provisions by (i) flagging test scores with the disclosure of disability information, (ii) reporting, disclosing, and identifying otherwise confidential information of Plaintiffs and Subclass members to colleges, scholarships, potential employers, and other third party organizations, and (iii) otherwise using or disclosing such confidential information in its programs and services to enable colleges, scholarships, potential employers, and other third parties to exclude students with disabilities from marketing, recruitment, and admissions and employment opportunities.

165. As a direct result of ACT's unlawful practices, the relevant Subclass members have incurred or will incur irreparable injury, including lost educational and scholarship opportunities.

166. Unless and until ACT is enjoined, ACT will continue to deny members of the Subclasses with the opportunity to participate in and benefit from ACT's programs and services on an equal basis as other students, demonstrating a real and immediate threat of repeated injuries to the

39

Case No.

members of the Subclasses and violations of their rights to full and equal access to the ACT Test and ACT's programs and services.  Members of the relevant Subclasses lack any adequate remedy at law, the balance of hardships favor members of the relevant Subclasses, and the public interest would not be disserved by an injunction.

### EIGHTH CAUSE OF ACTION
### DECLARATORY RELIEF
### (28 U.S.C. § 2201)
### (On Behalf of all Subclasses)

167.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged, as if fully set forth herein.

168.    An actual controversy now exists between Plaintiffs and ACT.  Among other things, Plaintiffs and ACT dispute whether ACT's information sharing policies and practices are violations of Plaintiffs' rights under the ADA, Unruh Act, California Constitution and the UCL.  These disputes are definite and concrete and involve the legal relations of parties having adverse legal interests.

169.    Plaintiffs, on behalf of themselves and the Subclasses, desire to have a judicial determination of the rights and obligations of themselves and ACT.  A declaratory judgment is appropriate and in the interests of justice.

170.    Specifically, Plaintiffs seek a declaration that ACT's acquisition and disclosure of disability information as described herein are violations of the rights of Plaintiffs and the Subclass members under the ADA, Unruh Act, California Constitution and UCL.

### PRAYER FOR RELIEF

Plaintiffs, on their own behalf and on behalf of the Subclasses, respectfully pray for judgment against ACT as follows:

1.    For an Order certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

2.    Designate and appoint Plaintiffs as Class Representatives;

3.    Appoint Plaintiffs' attorneys of record as Class Counsel;

4.    Enter judgment against ACT and in favor of Plaintiffs and the Subclasses for all

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

1    causes of action;

2        5.      Enter injunctive relief requiring ACT:

3            a)      to cease and desist from the collection or disclosure of any disability

4    information of any students to any third party, including postsecondary institutions, from the usage

5    of such information in any manner by ACT, and from the continuing violations of the rights of

6    Plaintiffs and Subclass members under the ADA, Unruh Act, California Constitution, and

7    California's Unfair Competition Law;

8            b)      to implement reasonable and appropriate corrective measures to redress

9    injuries to Plaintiffs and Subclass members, including seeking the return and/or destruction of

10   such information from third party organizations that have received disability information of any

11   Plaintiff or member of a Subclass, proof thereof, an accounting of all third parties to whom ACT

12   disclosed disabilities, and providing notice to all such third party organizations that the collection

13   and disclosure of such information was illegal and that the third parties should not ever use or

14   further disseminate such information; and

15           c)      to require ACT to take or not take other actions determined to be necessary

16   to remedy or cease violations of the rights of Plaintiffs and members of the Subclasses.

17       6.      As to the California Subclass, award treble damages and restitution to Plaintiffs and

18   the Subclass according to proof, but in no case less than the minimum statutory damages under the

19   Unruh Act of $4,000 for each and every offense;

20       7.      As to the State Mandate Subclass, award damages and restitution to the Plaintiffs

21   and the Subclass according to proof;

22       8.      Order ACT to disgorge all amounts that it has improperly received and retained

23   through its misconduct alleged herein;

24       9.      Award pre-judgment and post-judgment interest to the extent required by law;

25       10.     Award Plaintiff reasonable attorneys' fees and costs to the extent permitted by law;

26       11.     Grant appropriate declaratory relief;

27       12.     Appoint an ADA monitor to ensure ACT's full compliance with the ADA; and

28       13.     Grant such further relief as the Court deems appropriate.

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury as to all issues so triable in this matter.

DATED:  August 6, 2018                    PANISH SHEA & BOYLE LLP


By: _____

Rahul Ravipudi
Attorneys for Plaintiffs

PANISH SHEA & BOYLE LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700 phone • 310.477.1699 fax

Case No.

NATIONWIDE CLASS ACTION COMPLAINT